FILED
02 DEC -2 PM 2:51
U.S. DISTRICT COURT
N.D. OF ALABAMA

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION

JO ANN HAWKINS, as personal }
representative of the estate }
of BOBBY FRAZIER, deceased }
}
       Plaintiff, }
}
v. }       CV 01-AR-984-M
}
LEE TRAYLOR et al. }
}
       Defendants. }

ENTERED
DEC 2 2002

**MEMORANDUM OPINION**

    Before the court is a motion for summary judgment by defendants Lee Traylor ("Traylor"), David Walker ("Walker"), Chief of Fort Payne Police Department, and the City of Fort Payne Alabama ("City"). Plaintiff, Jo Ann Hawkins ("Hawkins"), as the duly appointed personal representative of the Estate of Bobby Frazier ("Frazier"), a deceased person, brings claims under 42 U.S.C. §1983 and Alabama Code §6-5-410(1975) for the wrongful death of Frazier. Hawkins asserts claims of a violation of Frazier's Fourth Amendment rights to be free of unlawful seizure; the existence of policies, procedures and/or customs within the City of Fort Payne, Alabama Police Department which led to, supported or caused the aforementioned Fourth Amendment violation; and negligent, wanton or intentional wrongful death under Alabama tort theories.



**Facts**

Frazier was shot and killed by defendant Traylor, a police officer for the City of Fort Payne. Traylor was on duty during the early morning hours of May 10, 2000. Traylor and another officer, Wade Parker ("Parker") were parked in their patrol cars at a Shell Service station located off Interstate 59 ("I-59") with their driver's side windows down conversing when they were approached by a motorist who had just exited the interstate. The motorist informed Traylor and Parker that there was a man out on I-59 southbound and that the man appeared to be in distress. The motorist informed the officers that he had nearly hit the man, and that there was a vehicle on the side of the road about a mile or so north (back). Parker radioed in the call to the dispatcher at 02:52:30, military time, and both officers entered the interstate. Traylor took the northbound ramp and proceeded north on I-59. Traylor was cruising the left lane of northbound I-59 at about 45 miles per hour. Traylor at some point lowered his driver's window and was looking across the median with his spot light on. Parker proceeded north down the emergency lane of the southbound exit ramp of I-59 against the flow of the southbound traffic. Traylor radioed at 02:55:19 that he had sight of a person and that "he is here at the back of the vehicle, it looks like." Parker responded that he needed a repeat of the call which Traylor acknowledged. Traylor then informed Parker that he

would have to go down to the next turn around, and travel back to the location. Traylor arrived first at the stalled automobile and radioed at 02:57:14 (02:57:12)[1] that he would be out on a subject Alabama tag # RZ169. Approximately seven seconds later, 02:57:21, Traylor reported 10-0, 10-0, Code 3, (2:57:28), which means use extreme caution officer needs assistance, life in danger. Eight seconds later at 02:57:29 officer Traylor radios 10-34 meaning "shots fired" (02:57:49) and 10-52 meaning "needs ambulance." Parker radioed that he had arrived as back-up unit at 02:58:09 (02:58:07).

Traylor's account of events is a culmination of the accounts that he gave to officers on the scene of the shooting, accounts of certain events given to Chief Walker in a private conversation later on during the morning of the tenth, a statement of events provided to the Alabama Bureau of Investigation ("ABI"), and his deposition testimony.[2] Traylor reported that as he approached the stopped vehicle, he saw a man propped up against the back of the vehicle with his arms crossed. Traylor stated that the man was wearing a jacket that was buttoned up all the way, a dark

---

[1]Times in parenthesis are the revised times done by officer Roger Wells on August 4, 2002, the day before his deposition, of the timing of events on the morning of May 10, 2000. The first times listed are the times listed on the original report produced as part of departmental protocol for Chief Walker on May 11, 2000.

[2]Traylor's accounting of events varied as events at the scene of the incident unfolded.

ball cap, and sunglasses. According to his deposition testimony Traylor was suspicious of the man because of the way he was dressed. According to Traylor, he pulled his patrol car within one to one and half car lengths behind the vehicle. It is Traylor's position that the man came towards him, and as he stepped out of the patrol car the man began moving towards his door at a faster pace. According to Traylor, the man reached into his front right pocket and when he withdrew his hand "he kept it cupped with his palm away from him as if he was palming or concealing something." According to Traylor's deposition testimony Frazier was at the front bumper of the patrol car at this time moving alongside the right fender. Traylor testified that he first saw the weapon, a knife, when the individual was alongside the tire of the patrol car. Traylor then asked the man, "what's the problem" or something to that affect. According to Traylor, the man then responded "I'll show you what the problem is." Then Traylor says the man raised his right hand and brought his left hand up to meet it and opened what appeared to be a single blade knife. Traylor was still in the position of having one foot out the door of the patrol car and one foot inside. Traylor testified he then yelled for the man to stop. According to Traylor the man then brought the blade up with his right hand as if he was about to try a stabbing motion and at the same time tried to grab the door of the patrol car with his left

4

hand. Then the man made a stabbing motion towards Traylor's head, which at the time was between the door and the body of the patrol vehicle. According to Traylor's testimony, he jerked the door away from the man and at the same time pulled his left foot off the ground causing him to drop back into the car as he jerked the door shut. Traylor then locked the door with his left thumb, drew his weapon with his right hand. At this time, Traylor testified he was dropping back into the seat of the patrol car with his right leg under the steering column, his left leg pulled up in front of him on the seat, and he was facing the window. At the same time, Traylor testified he was radioing the 10-0 call for assistance at 2:57:21 by reaching over with his left hand. Traylor testified he was yelling "get back" to the man just before he made the radio call. Traylor testified that he brought the weapon to bear on the man as he was facing the window. Traylor testified that his arms were slightly bent and his gun was about six to eight inches from his chest. According to Traylor, the man had come around with the door of the patrol vehicle as Traylor was closing it, and he was now facing the window. Traylor testified that at about this point he told the man "stop or I'll shoot." According to Traylor, he repeated the verbal commands two or three times for the man to "get back" and "stop or I'll shoot." Traylor and the man were yelling at each other; Traylor testified that the man was yelling "I'm not

5

getting back" and "You'll just have to shoot me." Traylor testified that the man then stepped back, then forward toward the door coming in low and began coming in the window of the patrol unit. At this point, Traylor was backed up in the seat against the console with the right side of his duty belt up against it. Traylor testified that the man was crouched and began putting his head into the window and turning his body, bringing his right shoulder up to break the plane of the window. Traylor fired a single fatal shot at the man's chest. Traylor testified that the man collapsed on the side of the car, slid sideways against the side-view mirror which broke the mirror, and then he fell to the ground. Several hours later Traylor told Chief Walker, in a private conversation after he returned to the station, that he had been uncertain of the man's condition just after the shooting so he had backed the patrol car until he could see him in front of the car. According to Traylor's account of the events, he then stepped out of his car behind the driver's door and brought his weapon to bear on the man. At this point, he radioed "shots fired" to the dispatcher.

    Parker arrived seconds later and observed Traylor in a crouched stance behind his driver's door with his gun pointing at the victim some nine feet in front of the patrol car. The victim lay near the line between the service lane and the right lane of southbound I-59 facing south. According to Parker's testimony he

searched the body with his expandable metal baton shortly after he arrived. The only object detected was a pair of prescription glasses that Parker retrieved from the left jacket pocket, which he returned after examination. No weapon was detected on or in the vicinity of the body. The man, who was later identified as Frazier, was lying on his left side and front, face down with his hands at approximately chest level slightly under his prone body. A pair of wire rimmed (brass colored) sunglasses were draped over two fingers of his right hand, and a dark ball cap lay nearby. There was a milk jug full of water near the body. Frazier was declared dead by Emergency Medical Services personnel (EMS) just after they arrived on the scene. An extensive search of the entire scene and the surrounding area was conducted after the shooting and no weapon or knife was detected. The expended shell casing from Traylor's Glock Model 22 service pistol was recovered from underneath the front bumper of Parker's patrol car which was parked just behind and to the right of Traylor's patrol car. Traylor's Glock pistol was loaded with (.40) forty caliber Smith & Wesson ammo. Frazier's body was 9 feet from the front of Traylor's patrol car, and Traylor's patrol car was 43 ½ feet from the rear of Frazier's vehicle. After Frazier arrived in Birmingham a folded pocket knife was found in his right pants pocket and inventoried just prior to autopsy. The autopsy revealed that Frazier was not intoxicated or on any medication

other than antihistamines.

Hawkins contends that under clearly established law, that the forensic evidence, inconsistent testimony, and lapses in investigatory technique show that there is a genuine issue of material fact as to whether Traylor's actions constituted an unjustified killing in violation of Frazier's Fourth Amendment rights.  In addition, Hawkins contends that Walker, as the designated policymaker for the City, allowed an officer with a questionable history to continue in a position which led to Frazier's death.  Hawkins points to the following forensic evidence to show that there are major inconsistencies in Traylor's accounting of the events of May 10, 2000.  Measurements at the scene indicated that Frazier's body was nine feet in front of Traylor's unit from the bumper to Frazier's foot.  Frazier's vehicle was 43 ½ feet from the front of Traylor's unit.  The shell casing was located three feet (3) and four (4) inches from the left rear tire of Traylor's unit, over eight feet from the door of Traylor's vehicle.  There was blood in an arterial spray pattern on the exterior of the Traylor vehicle on the left upper fender between the door and the wheel well, on the left side mirror, left driver's door and window (partially raised), on the left door handle area, on the left edge of the driver's seat, and the left side of the dashboard, and on the left floorboard. There was no arterial spray pattern on the inside of the vehicle

8

and Traylor's uniform was not tested. There were no reports that Traylor's uniform was bloody. Traylor left the scene escorted by Officer Barnes and was allowed to go home and make two phone calls before speaking with Chief Walker later in the morning at the station. Based on six tape lifts there was no gunpowder residue taken from the driver's side roof and visor area. Lifts from the jacket that Frazier was wearing did not reveal any gunpowder residue. Officer Traylor's pistol, a Glock Model 22 ejects spent casings backward and to the right. Traylor later attempted to explain the discrepancy in the position of the shell casing by telling Walker that he had heard the casing drop to the ground as he exited the car after he had backed up. No weapon was detected on Frazier's body at the scene, and no weapon was found in the vicinity of the body. A knife was found folded in Frazier's front pocket only after the body arrived in Birmingham. During the ABI and the Department's investigation it was learned that Frazier was a Vietnam Veteran that suffered from post-traumatic stress syndrome. Frazier had been repeatedly treated for his mental disorder, and was known to rant and rave when confronted.

    The autopsy revealed a penetrating gunshot wound through Frazier's chest just one and a half (1 ½) inches to the right of the center line. The bullet entered the body at the second intercostal space three and a half (3 ½) inches below the sternal

notch (throat/collarbone junction) and exited through the tenth intercostal space 20 ½ inches below the top of the head and two and a quarter (2 1/4) inches to the right of the center line. The overall projectile path was front to back and downward. Hawkin's expert, Richard Ernest, submitted expert testimony concluding that the shooting incident could not have occurred as Traylor described based on the forensic evidence.

After discrepancies were discovered at the scene Chief Walker left the scene and went back to the station where he spoke with Traylor in private.  It was at this point that Traylor first indicated to anyone that he had moved his patrol car just after the shooting.  The ABI was never informed that the vehicle was moved after the incident.  Chief Walker spoke to Traylor about the shooting incident in private even though he told officer Barnes and Traylor not to discuss the incident until reports were made and Traylor had spoken with the ABI.

Hawkins also contends that the City is liable for its failure to supervise Traylor.  According to Hawkins, Officer Traylor had several incidences that indicate that he had had recurring disciplinary problems, including later events dealing with the use of excessive force under particular circumstances. Prior to being hired as a police officer, Traylor worked as a dispatcher.  While working as a dispatcher Traylor was disciplined for not sending an ambulance on an EMT call.  Traylor

10

was also cited for failing to check the jail properly in accordance with policy. After joining the force, Traylor was cited for the improper use of pepper spray, considered under the departments excessive force policy, but the incident was not recorded on a personnel action form by Officer Parker, his supervisor at the time. The Fort Payne Police Department has had only three incidents of firearm discharge at a human being in the last sixteen years. Of those three events, Traylor was the shooting officer in two of them. In both incidents, no weapons could be found at the scene that were brought to bear on Officer Traylor causing him to fear for his safety. The first of these two events occurred approximately a year before the Frazier incident. Walker was in charge of determining whether the shooting was justifiable in that incident as well as in the present one. In both situations, Traylor was returned to his position about a week after the incident with no discipline and before a thorough investigation was completed. According to Hawkins, Walker has received little or no training in the field of investigation. In both incidents, the Frazier incident and the one occurring in 1999, Traylor was the first one to arrive on the scene, there were no other witnesses, no weapon was found, and Traylor was returned to duty shortly thereafter. The first incident did not result in injury. Testimony of several fellow officers indicated that Traylor "kinda" has a reputation of being

11

aggressive or rude, a little too quick to use the pepper spray, and perhaps even too quick on the trigger. There was also a report of another officer of the Fort Payne Police Department who was returned to duty after an incident involving a threat to commit suicide in a holdout situation. Hawkins argues that Walker's failures to follow proper investigatory techniques in the first incident plus the Frazier incident shows that Walker was not properly trained in the area of shooting investigations, and it is this lack of training and supervision that ultimate led to Frazier's death.

### Applicable Law

Both parties submit *Saucier v. Katz*, 121 S. Ct. 2151, 2156 (2001) as the dispositive case. According to the Court in *Saucier*, the district court must first decide the issue of qualified immunity before determining whether excessive force was used. A court required to rule on a qualified immunity issue must first consider whether the facts alleged, taken in the light most favorable to the non-moving party, show that the officer's conduct violated a constitutional right. One need not look at the instant case from the view most favorable to the plaintiff, to know that Frazier had a Fourth Amendment right to be free from excessive force used by the state, especially when the excessive force ended with death. See *Graham v. Connor*, 109 S.Ct. 1865 (1989); *see also Nolin v. Isbell*, 207 F.3d 1253, 1257 (11th Cir.

2000)(deadly force is not to be construed as the use of *de minimus* force, which is approved in nearly all situations).

The second step in the analysis is whether the law was clearly established at the time of the incident. This encompasses the notion that reasonable mistakes can be made as to the legal constraints on particular conduct. The officer might correctly perceive the facts, but be uncertain about what amount of force to use in those circumstances. This is not to say that the facts must be "materially similar" to the established case law to meet the qualified immunity requirement. Rather, the law must clearly put the officer on notice that his prospective conduct is unlawful. In other words, under the pre-existing law the unlawfulness must be apparent. Precedential cases need not be 'fundamentally similar,' but if they are they can provide strong support for a conclusion that the law is clearly established. *See Hope v. Pelzer*, 122 S. Ct. 2508 (2002).

### The Established Law

Hawkins relies on the Eleventh Circuit's *Samples On Behalf of Samples v. City of Atlanta*, 846 F.2d 1328 (11th Cir. 1988) to show that Traylor was on notice that the use of deadly force under the "totality of the circumstances" in the instant case was not appropriate. In *Samples,* an officer of the Atlanta Police Department shot a sixteen-year-old boy five times, killing him. There were no witnesses to the shooting which occurred around

4:00 a.m.. The record indicated the officer was responding to a call to investigate a demented person. Twenty-eight seconds later, the officer radioed the news of the shooting. Subsequent review of the shooting by the department and a review board exonerated the officer. The boy's family filed suit. The suit was examined on a summary judgment motion filed by all defendants. The district court granted summary judgment. The Eleventh Circuit reversed. Officer Oglesby, the shooting officer in *Samples*, was the only witness to the events that led up to the shooting. According to his testimony, he observed Samples screaming like a demented person in a phone booth. Oglesby left his car to investigate and attempted to question Samples who responded by cursing and throwing a bottle at the officer. Officer Oglesby then testified that Samples pulled a knife out of his pocket and began opening it. The officer ordered Samples to stop, but Samples proceeded forward in a threatening manner. Oglesby fatally shot Samples. A knife and bottle were found not far from Samples body. The forensic evidence shed doubt on the officer's accounting of the events. First the knife which lay near Samples body was unopened. The knife's blade was only three inches long. Oglesby and Samples were physically disparate. And finally, one of the shots was through the back.

The similarities between the *Samples* case and the instant case are sufficiently close to have given notice to Traylor and

the Fort Payne Police Department that shooting a person allegedly armed with a knife under circumstances such as were present on the morning of May 10, 2000, would be scrutinized, particularly in light of the fact that the knife was found in a position or condition where it would have been impossible to bring to bear on the officer.  In light of the forensic evidence, inconsistent testimony of several police officers, and sloppy or improper investigatory techniques used at the scene there is a genuine issue of material fact so that summary judgment must be denied.

    Hawkins argues that the issue of state law immunity under §6-5-338 also raised by defendants is "whether a defendant violated clearly established law," the same as it is under §1983 law.  *Sheth v. Webster*, 145 F.3d 1231, 1239 (11th cir. 1998); *see also Ex Parte City of Birmingham*, 624 So. 2d 1018 (Ala. 1993); *Marnon v. City of Dothan*, 677 So.2d 755 (Ala. 1995).  Furthermore, Hawkins contends that if Officer Traylor lied about the events of May 10, 2000, it tends to show that the shooting of Frazier was unlawful and motivated or supported by bad faith.  Also, Hawkins argues that established police rules and policy can eliminate some or part of an officer's discretion. *See Ott v. City of Mobile*, 169 F. Supp. 2d 1301 (S.D. Ala. 2001).  To the extent that a claim for negligence is asserted against Traylor for his actions in regards to the shooting death of Frazier, Traylor is protected by discretionary function immunity for

negligence claims. This is so because the standard that must be shown in order to deny Traylor immunity is whether he acted in regards to a discretionary act in bad faith, with malice, or with willfulness. If, however, under the alleged facts if Traylor acted without discretion because the course of his conduct was well defined by police policy and procedures then a claim for negligence may lie. Hawkins argues that under several scenarios 1)there was no weapon, 2) the knife had been folded and put away and Frazier was retreating, or 3) Traylor had more than enough time and the means to retreat by rolling up his window and isolating the subject; then, his acts in these circumstances would not have been discretionary and the use of deadly force was unlawful. The forensic evidence taken in the light most favorable to Hawkins' position shows that all three scenarios are plausible. Accordingly, Hawkins argues that it is not clear that Traylor's actions were completely discretionary under police policies and procedures.

Hawkin's last and final claim is against the City defendant for its failure to supervise/train Officer Traylor and Officer Walker. According to Hawkins, the City showed a deliberate indifference by not supervising Traylor when it was on notice of his propensity to use excessive force on several prior occasions. It is Hawkin's contention that rather than discipline Traylor, Walker gave him more and more responsibility, and Chief Walker in

his capacity as Acting Chief of Police was the City's agent responsible for disciplinary enforcement.

## Conclusions

Based on the foregoing the defendants' motion for summary judgment will be denied. A jury will be called upon to decide where the truth lies and where that truth leads.

DONE this 2nd day of December, 2002.

_____
WILLIAM M. ACKER, JR.
UNITED STATES DISTRICT JUDGE